

**SIGNED this 04 day of October, 2005.**

_____
**R. Thomas Stinnett**
**UNITED STATES BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION

In re:                                                  No. 03-16744
                                                        Chapter 7
THOMAS EDDIE ABBOTT
KATHY JEAN ABBOTT,

          Debtors.

UNION PLANTERS BANK, N.A.,

          Plaintiff,

v.                                                      Adv. Pro. 04-1037

THOMAS EDDIE ABBOTT,

          Defendant.

<u>**MEMORANDUM**</u>

Appearances:     Joseph Prochaska, Williams & Prochaska, P.C., Nashville, Tennessee,
                 Attorney for the Plaintiff.

                 C. Kelly Wilson, Wilson, Henegar & Murray, Shelbyville, Tennessee,
                 Attorney for the Defendant.

R. Thomas Stinnett, United States Bankruptcy Judge

This is a dischargeability proceeding.  The defendant, Thomas Abbott, operated A & F Irrigation, Inc., for many years before he and A & F both filed bankruptcy. About eighteen months before the  bankruptcies, Union Planters Bank lent A & F almost half a million dollars, and Mr. Abbott guaranteed payment of the debt. In this lawsuit, Union Planters contends that Mr. Abbott's debt to it for the unpaid balance of the loan can not be discharged in Mr. Abbott's bankruptcy case. Union Planters relies on bankruptcy code § 523(a)(2)(B). The question under that statute is whether Mr. Abbott obtained the loan by use of a materially false written statement concerning his or A & F's financial condition. 11 U.S.C. § 523(a)(2)(B). The court finds the facts as follows.

A & F started business in 1976 as a golf course landscaping and irrigation company, but it later dropped the landscaping work and limited itself to installing irrigation systems in golf courses. That was its sole business for 20 years or so before the trial. Mr. Abbott had been running A & F for more than 20 years. Five or six years before the trial, Mr. Abbott had a partner – another shareholder in A & F – but Mr. Abbott bought him out and assumed his liability to A & F for any shareholder advances he had received. At the time of the loan in question, Mr. Abbott was the sole shareholder and had sole responsibility for running A & F. He decided what jobs the business would take, when the business needed to borrow money, and who it would borrow the money from.

Sometime before obtaining the loan from Union Planters, Mr. Abbott became interested in re-financing some or all of A & F's secured debts at a lower interest rate. He wanted to improve A & F's cash flow – to reduce the monthly payout on secured debts so that A & F would have more money available for other uses. Mr. Abbott and A & F had past dealings with Traders National Bank of Tullahome and First National Bank of Tullahoma. A & F's debt to Traders National had sometimes exceeded $1,000,000. According to Mr. Abbott, First National and Traders National declined to make a debt consolidation loan because each bank had a limit on the amount of debt from one customer. First National's president, Brac Thoma, testified that First National reached the point that it chose not to lend any more money to Mr. Abbott.  Mr. Thoma and someone at Traders National suggested to Mr. Abbott that he try American City Bank because it might be able to handle a loan of the size he wanted.

In the winter of 2000, Mr. Abbott approached American City Bank about obtaining a loan to consolidate A & F's secured debts. (Mr. Abbott did not specify whether he meant the winter of 1999–2000 or the winter of 2000–2001.) A & F already owed a debt to American City Bank secured by some of A & F's equipment. Mr. Abbott dealt with George Vibert at American City Bank. The proposed loan would have been 1.6 to 1.7 million dollars. A & F spent a considerable amount of money to gather the information Mr. Vibert requested, but after two or three months of talk, American City Bank decided not to make the loan.

In May 2002 Mr. Abbott was still looking for a loan to consolidate some or all of A & F's secured debts at a lower interest rate. A & F was behind in payments on its secured debts but not to the point that any of the secured creditors were threatening legal action. The interest rate on some of the secured debts was 10% or more. A customer of Union Planters recommended it to Mr. Abbott's son-in-law, who was working for A & F at the time. Mr. Abbott knew Tommy Anderton, the president of Union Planters Bank of Shelbyville. Mr. Abbott and Mr. Anderton had grown up in Tullahoma, Tennessee and had known each other for more than 40 years. Mr. Abbott referred to Mr. Anderton as a friend. He testified that he and Mr. Anderton had ridden bicycles together when they were boys, but they had not socialized as adults. They did not go out to eat together or visit in each other's homes or play golf together. Mr. Abbott also testified that he had never done business with Mr. Anderton or his bank.

Mr. Anderton agreed with the statement that he and Mr. Abbott were friends. He had known Tommy Abbott for about 40 years. They both grew up in Tullahoma and probably met as boys when they were getting around Tullahoma by bicycle. They played baseball on rival teams. Mr. Anderton respected Mr. Abbott for getting involved in athletics, including umpiring and officiating. He testified that: "Tommy Abbott was one of the most respected guys that come through Tullahoma, and he was, you know, just someone you looked up to."

Their paths diverged for many years after Mr. Anderton graduated from college in 1976 and started his adult working life in the banking business. In 1994, Mr. Anderton went to work at Union Planters Bank of Shelbyville. In May 2002 he received a call at the bank from Mr. Abbott. Mr. Abbott

said he needed some financial help, and Union Planters had been recommended by one of its customers. They set up a meeting to discuss a possible loan to A & F.

Mr. Abbott and Mr. Anderton apparently met two times, and at least one of the meetings was at Mr. Abbott's office.  As to these meetings, Mr. Abbott testified as follows:

He and Mr. Anderton agreed to a meeting at 7:30 a.m. the next day or within a few days after his telephone call. They met in Mr. Abbott's office, not at the bank. He told Mr. Anderton that A & F was having cash flow problems and needed to borrow some money. He revealed that he had tried to obtain a debt consolidation loan from American City Bank, but it did not work out, and he did not want to deal with American City Bank. He and Mr. Anderton looked at a list of equipment that showed the secured lenders, the monthly payments, and the interest rates. They talked specifically about the debts to American City Bank and John Deere that were both secured by equipment. Mr. Anderton said that Union Planters could offer a better interest rate than John Deere. Mr. Anderton got out his calculator and figured the monthly payments to John Deere and American City Bank were about $12,000. After doing some more figuring, Mr. Anderton said that Union Planters could help with A & F's problem by making a loan to take out those secured debts. Mr. Anderton calculated that the monthly payment on the take-out loan from Union Planters would be about $9,000. Mr. Anderton told him that Union Planters would be able to make the loan.  At the least, Mr. Anderton said he thought they could work out a loan of up to half a million dollars, and he had authority to approve a loan in that amount. Mr. Anderton said he would get the information he needed from Mr. Abbott's secretary and get back in touch with him. Mr. Anderton did not tell Mr. Abbott that approval of the loan depended on checking out A & F's cash flow to determine if it could make the monthly payments or checking out other financial information to be furnished later.

Mr. Abbott did not recall what documents were given to Mr. Anderton that morning. He remembered looking at a document showing the equipment loans with the payment amounts and the interest rates. He told Mr. Anderton to get whatever other information the bank needed from Kay, Mr. Abbott's secretary. She came in to the office at her usual time, about 8 a.m., while Mr. Anderton was still there.

He made clear to Mr. Anderton that First National Bank of Tullahoma had a first lien on everything. He had a set speech that he made whenever he talked to a bank, even Traders National, about obtaining a loan. He would tell the banker that Brac had a first lien on equipment, contracts, future contracts, and all his children. Mr. Abbott was referring to Brac Thoma, president of First National Bank of Tullahoma. He made the same speech to Mr. Anderton. Furthermore, when Mr. Anderton came to his office, and they talked about American City Bank, he told Mr. Anderton that he did not know whether American City Bank had obtained a subordination agreement from First National, and Mr Anderton replied that they [Union Planters] would take care of it. This

was not a deep discussion between him and Mr. Anderton of First National's blanket lien on A & F's equipment. It was just a comment he made to Mr. Anderton.

Mr. Anderton testified as follows:

The first meeting took place at the bank, not in Mr. Abbott's office. Mr. Abbott told him that A & F needed a loan to help solve a cash flow problem and get some working capital. Mr. Abbott did not request a specific amount; he just said he needed help. Since Mr. Abbott did not ask for any specific amount, Mr. Anderton looked at the value of the proposed collateral to determine how much Union Planters could lend. He and Mr. Abbott worked from a document showing A & F's debts secured by equipment. The document was like the first page of exhibit 7, which lists ten pieces of equipment with the names of the lienholders, the purchase prices, and the fair market values.

Union Planters needed an appraisal of the equipment to determine how much it could lend, and Mr. Abbott recommended Randy Barton as an appraiser. Mr. Barton was employed by a local equipment dealer. A & F provided Union Planters a list of equipment that could be used as collateral for the loan. The list, exhibit 7, included twelve pieces of equipment and some accessories. The ten pieces of equipment listed on the first page are shown as subject to security interests held by American City Bank, John Deere, and First National Bank. The two pieces of equipment listed on the second page are identified as "Paid For" and no lienholders are shown. The original list of equipment did not include the paid for equipment.  Mr. Anderton received the list of paid for equipment at a second meeting with Mr. Abbott. The second meeting was when he went by Mr. Abbott's office at 7:00 or 7:30 one morning. It occurred a day or two after their first meeting at the bank.

In Randy Barton's appraisal, he valued the ten pieces of equipment that were subject to security interests at $587,000. He valued the two pieces of "Paid For" equipment at $45,000. Without the paid for equipment as collateral, Union Planters would not have lent A & F any working capital. With the paid-for equipment, Union Planters was able to lend A & F some working capital. Most of the loan was intended to pay off the secured debts shown on the first page of the equipment list.

At the second meeting at Mr. Abbott's office, Mr. Anderton also received A & F's financial statement and Mr. Abbott's personal financial statement.

Mr. Abbott never told him that First National had a blanket lien on all A & F's equipment, including the equipment that was supposed to secure the loan debt to Union Planters.

This was not all of Mr. Anderton's testimony relative to the making of the loan to A & F. Mr. Anderton testified that he did not usually meet with customers seeking loans, but he met with Mr. Abbott and continued to be involved in the transaction because of their long acquaintance. It was

not his job to verify information obtained from the potential borrower. His job was finding acceptable lending opportunities. He would make an initial decision on whether the value of the collateral was sufficient to justify the proposed loan – the loan to value ratio. If the proposed loan came within the bank's guidelines on loan to value ratio, then Mr. Anderton would turn the transaction over to someone else to take the steps required to close the loan and perfect the security interest. The loan to A & F was a collateral based loan. Mr. Anderton determined that the ratio of loan amount to the value of the collateral was within the bank's guidelines. After receiving a fax of Randy Barton's appraisal of the equipment, he had the collateral value, and it allowed a loan commitment of about $480,000. The next step in the process was to obtain financial information for A & F and Mr. Abbott. A financial statement was required before Union Planters would make the loan. He would not have approved the loan if he had known that First National had an earlier security interest in the equipment. He had never made a loan on the basis of a second mortgage on equipment. He turned the transaction over to John Sorrells to get the loan ready for closing and to perfect the security interests.

In the process of obtaining the loan, Mr. Abbott or his secretary gave Union Planters three documents (1) A & F's financial statement as of December 31, 2000; (2) Mr. Abbott's personal financial statement as of December 31, 2000; (3) the previously mentioned list of equipment to secure the loan. Union Planters relies on errors in or omissions from these documents as grounds for excepting the debt from discharge.

Mr. Abbott was asked if he knew that Union Planters would use the financial statements to decide whether to make the loan. Mr. Abbott testified that after his first meeting with Mr. Anderton, he thought the loan was approved. He provided the financial statements and other information because Union Planters requested it. He thought that Union Planters needed the financial statements for its file. He did intend to give accurate information to Union Planters.

The loan documents executed by Mr. Abbott contained the usual assurances about the financial information provided to Union Planters in connection with the loan. In the personal guarantee Mr. Abbott represented or warranted that the most recent written financial information provided to Union Planters in connection with the loan was correct, that it presented an accurate picture of his

6

financial condition as of its date, and that there had been no subsequent, material adverse change in his financial condition. In the security agreement, Mr. Abbott and A & F represented that the collateral was not subject to any other security interests or filed financing statements. Mr. Abbott did not read the documents before signing, and he did not assume that they contained statements such as these. On the other hand, he was not surprised such statements were included. Mr. Abbott stated that he and Mr. Anderton agreed to a loan at their first meeting. After that, he went through the transaction as he had done with many loan transactions in almost 30 years of doing business. He provided the information requested by the bank and signed what they put in front of him.

As mentioned earlier, Mr. Anderton turned the transaction over to John Sorrells, whose job was to prepare the loan for Mr. Anderton's approval. Mr. Sorrells described his job as underwriting the loan and getting it ready for Mr. Anderton to sign. By underwriting, Mr. Sorrells meant doing a financial analysis and making sure the collateral was adequate. Mr. Sorrells stated that approving the loan was Mr. Anderton's job, and Mr. Anderton had already made that call before Mr. Sorrells became involved. He considered it unusual for Mr. Anderton to say the loan was going to be made before the analysis was done. Normally Mr. Sorrells would work up the numbers first, and then Mr. Anderton would approve the loan. Mr. Sorrells attributed the different treatment of this loan to Mr. Anderton's 40 year relationship with Abbott: Mr. Anderton's decision to make the loan decision was based on other factors.

In light of Mr. Anderton's apparent pre-approval of the loan, Mr. Sorrells relied on the accountants' numbers for A & F and Mr. Abbott's numbers for himself. Mr. Sorrells took A & F's financial statement at face value because it was prepared by certified public accountants. He took Mr. Abbott's financial statement at face value because Mr. Abbott prepared it and signed it and was a lifelong friend of Mr. Anderton. He did not attempt to verify the information in the financial statements. He looked at Mr. Abbott's income statement and personal financial statement to see if the bank would have anything to collect from if Mr. Abbott's plan didn't work out. Mr. Sorrells did not analyze the financial statements, but he made a cash flow analysis. According to the numbers he was given, the cash flow would work — A & F could make the loan payments. Mr. Sorrells denied that he was out of

the loop on approval of the loan. If the cash flow analysis had shown that A & F could not service the loan debt to Union Planters, then he would have talked to Mr. Anderton, who would have decided whether to continue.

Mr. Sorrells prepared the new credit proposal. He took the liquidity, net worth, and annual salary numbers directly from A & F's financial statement. In the new credit proposal, Mr. Sorrells noted only one exception to Union Planters' lending policies; the proposed loan was 76% of the value of the collateral, one percent above the Union Planters' policy of lending no more than 75%.

Mr. Sorrells testified that he noticed in the documents two different names for the corporation, and when he asked Mr. Abbott which name was correct, Mr. Abbott told him to use the name in the accountants' financial statement, which was A & F, Incorporated. That name was incorrect; the company name was A & F Irrigation, Inc. Mr. Abbott did not remember Mr. Sorrells' asking him for the company's correct name, but admitted that if Mr. Sorrells asked, he may have told him to use A & F, Inc. Mr. Anderton testified that with a loan of this size, Union Planters would normally get a corporate resolution from the borrower. He admitted it was not done with this loan, but said that closing the loan was not his job. Mr. Abbott's lawyer asked Mr. Sorrells' whether it was prudent to obtain an official copy of the charter from the secretary of state when the bank has doubts about name of the corporate borrower. Mr. Sorrells admitted that only asking Mr. Abbott for the correct name was a deviation from Union Planters' usual procedure.

Brac Thoma, the president of First National, testified that when it makes a secured loan to a corporation, it requires a copy of the corporate charter stamped by the Tennessee Secretary of State. Mr. Thoma recognized that First National had made a UCC (Uniform Commercial Code) filing in the name of A & F, Inc., instead of A & F Irrigation, Inc. He also conceded that the company had deposit accounts at First National under the name A & F, Inc. On the other hand, Mr. Thoma knew there were changes in the corporation's name over the years, but he could not say exactly when they occurred and did not know the corporation's correct name when First National made the UCC filing under the name A & F, Inc.

Before making the loan, Union Planters had Mr. Abbott's personal financial statement that identifies the company as A & F Irrigation. Exhibit 9. (This may be the document that provoked Mr. Sorrells to ask for the company's correct name.) The correct name also appears on Exhibit 7. That is the equipment appraisal that Union Planters obtained before making the loan. Mr. Anderton's fax number is handwritten on the appraisal, and it bears a fax machine legend showing that it was faxed to or from A & F Irrigation, Inc.

Union Planters alleges that the documents provided by Mr. Abbott also failed to reveal First National's blanket lien on A & F's equipment. The equipment list does not show a debt to First National secured by a blanket lien on all of A & F's equipment. It shows First National having a security interest in one piece of equipment. The equipment list does include a $302,000 debt to American City Bank at 9.5% interest and secured by several trenchers. In A & F's financial statement, the notes section lists a line of credit in the amount of $300,030, with an interest rate of 9.5%, and secured by accounts receivable, contract rights, chattel paper, inventory, and equipment. It does not identify the creditor, but Mr. Abbott identified the creditor as First National Bank. Mr. Abbott admitted that, considering the debt amounts and the interest rates, the $300,000 line of credit in the financial statement almost matched the $302,000 secured debt to American City Bank. Mr. Abbott distinguished between the two debts on the ground that one was a line of credit and the other was secured by particular items of equipment.

Since Mr. Anderton did not review the notes section of A & F's 2000 financial statement, he did not see that the list of debts included a $300,000 line of credit secured by most of A & F's assets, including equipment. Mr. Anderton testified that the description of the lien securing the line of credit is not consistent with the description that Union Planters uses for a blanket lien because it does not refer to property "hereafter acquired."

Mr. Sorrells, who prepared the loan for Mr. Anderton's approval, testified that he took the $300,000 line of credit in the financial statement to be A & F's debt to First National Bank. Mr. Sorrells stated that he had never denied that Mr. Abbott disclosed A & F's secured debt to First

National before the loan was made. Mr. Sorrells knew that Mr. Abbott wanted to maintain his banking

relationship with First National and did not want Union Planters to pay off First National.

On the other hand, Mr. Sorrells testified that he had no earthly idea that First National

had a blanket lien on any of the equipment that was to be Union Planters' collateral. According to Mr.

Sorrells, Union Planters' collateral was supposed to be the paid for equipment and the equipment

subject to the security interests of American City Bank and John Deere. Mr. Sorrells testified that he

did not run a check of UCC filings to find out if anyone else claimed a security interest in that

equipment, and the failure to do so was a deviation from Union Planters' normal procedure. He didn't

do it because he understood the loan was approved when Mr. Anderton brought Mr. Abbott to his

office, and because Mr. Anderton had a lifelong relationship with Mr. Abbott and trusted him.

Brac Thoma, the president of First National, testified that it was against First National's

policy to make a loan secured by equipment without doing a UCC search.

Mr. Abbott's testimony did not exactly explain his idea of "paid for" equipment. Mr.

Abbott seemed to make a distinction between a blanket lien on equipment and a lien on particular

pieces of equipment to secure a particular loan debt. Once the particular loan debt was paid off and

the lien was released, then the equipment was paid for, even if another creditor's blanket lien still

applied to it. Mr. Abbott also described equipment as paid for if it did not secure an installment loan

debt. Mr. Thoma, the president of First National, testified that as a banker he understood "paid for" to

mean the original or purchase money lien had been paid off. He conceded, however, that he might

have answered the question differently in a different situation – if he did not personally know about

First National's blanket lien. In any event, Mr. Abbott's definition of paid for equipment apparently did

not agree with Mr. Anderton's or Mr. Sorrells' definition.

Union Planters' complaint relies on several problems with the two financial statements.

Recall that both financial statements were dated December 31, 2000 and were being used in May

2002 to obtain the loan from Union Planters.

Mr. Abbott's financial statement shows a net worth of about $769,000. The financial

statement lists non-marketable securities as one of Mr. Abbott's major assets. They are valued at

$515,564 – almost 30% of his assets. The non-marketable securities were Mr. Abbott's stock in A & F. That conclusion is backed up by A & F's financial statement. The same amount ($515,564) appears in A & F's financial statement as retained earnings. Mr. Abbott's financial statement listed his other major asset as real estate valued at almost $900,000 – about 51% of his assets.

Mr. Abbott's financial statement failed to list his large debt to A & F for advances to shareholders. Union Planters referred to a debt of $704,000. This amount comes from A & F's 2001 financial statement. Before it made the loan, Union Planters had A & F's 2000 financial statement, which shows advances to shareholders totaling about $689,000. If the court subtracts the $704,000 debt for shareholder advances from Mr. Abbott's net worth, then his net worth at the end of 2000 is reduced to about $65,000. The notes section of A & F's 2000 financial statement also shows a debt of $64,000 guaranteed by Mr. Abbott but not listed on his personal financial statement as a contingent liability. Subtracting that debt reduces Mr.Abbott's net worth to almost zero at the end of 2000.

A & F's 2001 financial statement shows that Mr. Abbott's debt to A & F for shareholder advances had increased to $825,000 at the end of 2001. Union Planters did not have A & F's 2001 financial statement before making the loan in May 2002. Mr. Abbott testified that when he obtained the loan, he knew he owed A & F a debt for shareholder advances but did not know the amount. Mr. Abbott testified that he had no way to pay the debt for shareholder advances except from A & F's income. Mr. Abbott further testified that he paid $300,000 to $400,000 on the debt in the next year by using a personal line of credit from First National.

Mr. Abbott's personal financial statement also did not list any contingent liabilities. Over the years he had regularly guaranteed debts of A & F. Mr. Abbott's personal bankruptcy petition treated all of A & F's unsecured debts as his personal debts, but he did not guarantee all of the corporation's debts. He listed the corporation's debts as his debts because the corporation was a subchapter S corporation for tax purposes, and he took that to mean that he was the corporation, and as a result, he owed whatever it owed. He did guarantee A & F's debts to Union Planters, First National, Traders National, and Mrs. Culbertson. He did not list these on the financial statement as contingent liabilities. He did not know what it meant for a liability to be contingent. He assumed that

"liability" simply meant something he owed. He also thought the guaranteed debts were listed in A & F's financial statement.

   In the course of making the loan, Mr. Anderton did not ask Mr. Abbott whether he was personally liable on A & F's debt to American City Bank or John Deere. He knew that in normal banking circumstances Mr. Abbott would be personally liable on all of A & F's banking debts. In equivalent situations, he always expected Union Planters to obtain a personal guarantee, and he did not know of any bank that would not expect to obtain a personal guarantee. He also testified that Mr. Abbott's personal liability on A & F's debts should have been important in deciding whether to make the loan.

   A & F's financial statements show that its accounts payable were about $600,000 more at the end of 2001 than at the end of 2000. Mr. Abbott testified that when he was obtaining the loan from Union Planters, he did not know the accounts payable had changed that much. He pointed out that A & F's accounts payable could increase by $800,000 in one day when A & F bought material for a job, and if A & F did not receive payment from the contractor, so that it could pay for the materials, then the debt would show up on an end of the month financial statement as an increased debt, but he would not have necessarily known that.

   A & F's retained earnings at the end of 2001 were about $200,000 less than at the end of 2000. No one asked Mr. Abbott about the reason for this change or whether it was something he would have or should have known when he gave the financial statements to Union Planters in May 2002.

   Mr. Abbott admitted that he did not tell Union Planters about either of these changes:

> "They didn't ask me I mean, I wouldn't have known to tell them anyway. Tommy came to my office, and we talked about making a loan, and that's what we did. And I said, whatever information you need, Kay would be more than happy to give it to you.

   Mr. Abbott testified that he did not discuss the financial situation with Mr. Sorrells. They did not discuss Mr. Abbott's personal financial statement. No one from Union Planters asked him about his personal net worth or asked him to update the financial information that had been provided

to Union Planters. Indeed, he had no discussion with anyone at Union Planters about the written financial information. He and Mr. Sorrells also did not talk about First National's blanket lien. He did not talk with anyone at Union Planters specifically about the $300,000 line of credit shown in A & F's 2000 financial statement. He thought everything had been worked out between First National and Union Planters.

Mr. Anderton testified that he relied on the financial statements in three respects. First, A & F's financial statement showed that it made money, about $80,000. Second, A & F's financial statement showed liquid assets of about $180,000 (cash and receivables). Third, Mr. Abbott's financial statement showed substantial net worth. Mr. Anderton testified that he could not have approved the loan if he had known that Mr. Abbott had a negative net worth. Likewise, he would not have had the personal authority to approve the loan if he had known that A & F's liabilities had increased by more than a million dollars from the end of 2000 to the end of 2001 because the loan would have been outside of Union Planters' guidelines.

Mr. Anderton did not know about the mistakes in Mr. Abbott's personal financial statement, including the failure to list his debt to A & F for advances to shareholders, until the day of the trial. In Mr. Anderton's pre-trial deposition, his main complaint about the transaction was the alleged failure to disclose First National's blanket security interest.

Mr. Sorrells testified that he looked at the net worth of A & F and Mr. Abbott as shown by the 2000 financial statements. He admitted that A & F's positive net worth depended on whether Mr. Abbott could pay his debt to A & F for advances to shareholders. Mr. Sorrells also testified that A & F's cash flow did not have any specific relationship to its net worth. Finally, Mr. Sorrells stated that the loan was asset based and cash flow based, and net worth did not have anything to do with whether the loan was made.

Union Planters made the loan about ten days to two weeks after the first meeting of Mr. Abbott and Mr. Anderton. The loan actually totaled $481,250, but the court will refer to it as the $480,000 loan. The monthly payment was $9,784.47. Most of loan was intended to pay A & F's debts to John Deere and American City Bank that were secured by the particular pieces of equipment that

were to become Union Planters' collateral. Union Planters did not write three checks – a check jointly payable to A & F and John Deere, a check jointly payable to A & F and American City Bank, and a third check to A & F for the working capital. Union Planters wrote one check to A & F or Mr. Abbott. Mr. Abbott used the money to pay the secured debts to John Deere and American City Bank. No one from Union Planters called him to make sure those secured debts were paid.

After the $480,000 loan was made, Mr. Abbott mentioned to Mr. Anderton that he would like to consolidate all the business debt into one loan. According to Mr. Abbott, Mr. Anderton told him that they needed to wait and see how A & F did with the $480,000 loan. About a month after the $480,000 loan was made, Mr. Abbott went to Mr. Anderton's office to talk about a larger loan to A & F for the purpose of consolidating more debts. Mr. Abbott thought that he might have given Union Planters the 2001 financial statement for A & F at that time.

A & F made the monthly payments on the $480,000 loan for June, July and August 2002. In September of 2002, Union Planters lent A & F another $50,000 on a 30 day note. The loan was intended for A & F's payroll and other operating expenses while it waited on payment from a contractor that owed A & F for subcontract work. Union Planters certainly received the 2001 financial statements for A & F and Mr. Abbott before making the $50,000 loan.

A & F failed to pay the 30 day note for the $50,000 loan when due. About five days after it was due, Mr. Abbott called Mr. Sorrells at Union Planters. Mr. Sorrells said he could not talk to Mr. Abbott since the debt was past due, but Mr. Abbott told him that the contractor had been thrown off the job, and he was not sure when A & F would receive payment for its work.

A & F missed the monthly payments on the $480,000 loan for September, October, and November 2002. Union Planters referred the loan to the special assets department. John Barnes was the regional manager of that department. He testified that the special assets department handles troubled or substandard loans. The loan is assigned to someone in the department who will try to rehabilitate it or move it to a different lender.  The $480,000 loan to A & F came to his attention in November 2002 or earlier.

Apparently Mr. Barnes' department was also demanding payment of the $50,000 note. A & F paid that debt around the end of 2002. A & F was able to pay the $50,000 debt with money it collected, money provided by Mr. Abbott's mother, and money that Mr. Abbott received by closing out an IRA (Individual Retirement Account).

The idea of using the IRA for loan payments came up in Mr. Abbott's discussions with Mr. Barnes after A & F became delinquent in paying its debts to Union Planters. Mr. Abbott received $29,000 to $30,000 from closing out the IRA. He applied the money to payment on the $50,000 loan and to the December 2002 payment on the $480,000 loan.

In late 2002 or early 2003 Mr. Abbott had the idea of selling some bulldozers and paying the expected sale proceeds, about $60,000, on the $480,000 loan. Mr. Abbott thought two of the three bulldozers were subject to Union Planters' security interest. Mr. Barnes remembered thinking that all three bulldozers were already Union Planters' collateral. Mr. Abbott believed that Union Planters had the first claim to the money from the bulldozers, ahead of any claim by First National. Mr. Abbott thought the bankers had worked out that problem so that Union Planters had the equipment for its collateral. Mr. Barnes agreed that Mr. Abbott seemed to be operating on the assumption that Union Planters' security interest was the first lien on the bulldozers. According to Mr. Abbott, the price for the bulldozers would have been much lower in the winter months, at the time of the proposed sale. Mr. Barnes turned down the idea of selling the bulldozers because they were already Union Planters' collateral, and the proposed sale would bring much less than the appraised value of the bulldozers only a few months earlier.

Mr. Abbott testified that A & F made eleven payments on the $480,000 loan. A & F made the first three monthly payments in June, July, and August 2002. It missed the September, October, and November 2002 payments. A & F then made payments in December 2002, January through April 2003, and August 2003. Mr. Abbott also thought that A & F made payments in May and September 2003. If those two payments are included, then A & F made eleven payments. Eleven full payments would be $107,629.17. Mr. Abbott testified that A & F paid about $107,000 on the $480,000 loan.

15

At some time, Mr. Anderton of Union Planters talked to the president of First National, Brac Thoma. The testimony regarding this conversation was offered as relevant to whether Mr. Anderton and Union Planters knew, before making the $480,000 loan, that First National had a blanket lien on A & F's equipment. Mr. Anderton testified that his conversation with Mr. Thoma was six to eight months after Union Planters made the $480,000 loan and that it was after A & F was delinquent in making payments. He and Mr. Thoma discussed dividing Mr. Abbott's personal debts and A & F's business debts between the two banks.

Mr. Thoma testified that Mr. Anderton called him from his office and that Mr. Abbott was there with Mr. Anderton. He did not remember discussing First National's blanket lien on A & F's property. He assumed that Union Planters knew about it. He and Mr. Anderton discussed possible future lending by the two banks. He told Mr. Anderton that First National would be glad to work with Union Planters, but being a small bank, First National was not willing to lend any more to the business and would prefer to take only the personal side of the credit. Several facts led to Mr. Thoma's assumption that Union Planters knew about First National's blanket lien. Two facts were the size of the loan by Union Planters and the fact that Union Planters was paying off some equipment debt. He assumed Union Planters was securing the loan with the equipment. He recognized that paying off the equipment debts would make First National's security interest the first lien on the equipment, but the discussion with Union Planters continued at some point about one bank taking the personal credit and the other taking the business credit so that it would work itself out over time. Mr. Thoma acknowledged that it would have made sense for them to talk about subordinating First National's security interest, but they did not talk about it. The main factor in leading Mr. Thoma to believe that Union Planters knew about First National's blanket lien was the discussion of splitting the debts between the two banks according to whether they were business or personal.

Mr. Thoma did not know whether the first call from Mr. Anderton came before or after Union Planters made the $480,000 loan to A & F. Mr. Thoma thought it was highly unlikely that the conversation took place six months after Union Planters made the loan in May 2002; he thought the conversation took place in May 2002, about the time that Union Planters made the large loan. He

knew from the conversation that Union Planters had already lent money to A & F or was in the process

of lending it some money. When Mr. Thoma was asked if Mr. Anderton talked to him while he was on

vacation in Florida in the summer of 2002, Mr. Thoma said they may have had a conversation then.

He remembered having several conversations with Mr. Anderton in the summer of 2002, and they

were all along the same lines: what did Union Planters want to do with the credit, and what was First

National willing to do?

DISCUSSION

Section 523(a)(2)(B) excepts from discharge a debt for money or credit to the extent

it was obtained by use of a statement in writing (I) that was materially false, (ii) respecting the debtor's

or an insider's financial condition, (iii) on which the creditor to whom the debtor is liable for such money

or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to

deceive. 11 U.S.C. § 523(a)(2)(B). Union Planters can prevail in this lawsuit only to the extent it proves

all of these elements for all or some portion of the debt.

There is no dispute that A & F was an insider of Mr. Abbott. 11 U.S.C. § 101(31)(A)(iv).

There is also no dispute over whether Mr. Abbott's debt can be excepted from discharge under §

523(a)(2)(B) even though he obtained the loan for the corporation, A & F Irrigation. *Brady v. McAllister

(In re Brady)*, 101 F.3d 1165 (6th Cir. 1996); *see also Capitol Indemnity Corp. v. Interstate Agency,

Inc. (In re Interstate Agency, Inc.)*, 760 F.2d 121 (6th Cir. 1985); *Vulcan Coals, Inc. v. Howard*, 946

F.2d 1226 (6th Cir. 1991); *Airlines Reporting Corp. v. Ellison (In re Ellison)*, 296 F.3d 266 (4th Cir.

2002); *Lawrence Freight Lines, Inc. v Transport Clearings-Midwest, Inc., (In re Transport Clearings-

Midwest, Inc.)* 16 B.R. 890 (Bankr. W. D. Mo. 1979); *First Colony Life Ins. Co. v. Coover (In re

Coover)*, 70 B.R. 554 (Bankr. S. D. Fla. 1987).

<u>The corporation's name</u>

Union Planters understood that its security interest would have first priority in its

collateral, but the security interest ended up behind First National's blanket security interest. This lack

of priority did not result from Union Planters' filing a UCC financing statement under the wrong name.

If Union Planters had filed a financing statement under the correct name, First National's security

17

interest would still have had priority, and apparently First National would still have been entitled to all the proceeds from Union Planters' collateral. The priority problem arose earlier in the loan process. It resulted from Union Planters' decision to make the loan on the basis of its understanding that its security interest would have first priority in its collateral. The question, then, is whether having the wrong name for the corporation contributed to Union Planters' decision to make the loan, including the underlying belief that its security interest would have first priority in its collateral. The evidence does not show it. Union Planters did not check the UCC filings or other records for liens on A & F's property. Thus, having the wrong name did not prevent Union Planters from discovering First National's security interest by outside investigation. Union Planters' decision to make the loan, with the understanding that its security interest would have first priority, was based on conversations with Mr. Abbott and written information he provided. The evidence does not show that having the wrong name for the corporation influenced Union Planters to believe that its security interest would have first priority or otherwise influenced it to decide to make the loan. In summary, the evidence does not show that Mr. Abbott's failure to give Union Planters the correct name for the corporation caused it any loss. *Citik Ka Wah Bank Limited v. Wong (In re Wong)*, 291 B.R. 266 (Bankr. S. D. N. Y. 2003).

A & F's and Mr. Abbott's 2000 financial statements

Mr. Anderton testified for Union Planters that he relied on A & F's 2000 financial statement in two respects; it showed (1) liquid assets of about $180,000 and (2) net income for the year of about $80,000. Union Planters did not prove that either of these statements was false.

Union Planters also argued that A & F's 2000 financial statement was materially false as the result of changes in A & F's financial condition between the end of 2000 (the date of the financial statement) and the time of the loan (May 2002). Union Planters made the argument that (1) Mr. Abbott presented the financial statement as still accurate at the time of the loan; (2) the financial statement was false because A & F's financial condition had materially worsened between the date of the financial statement and the time of the loan; (3) Mr. Abbott should have revealed those material adverse changes but failed to do so; (4) Union Planters relied on the accuracy of the financial

18

statement in deciding whether to make the loan; (5) Union Planters' reliance on the accuracy of the financial statement was reasonable.

Union Planters used A & F's 2001 financial statement to show the alleged deterioration of A & F's financial condition. Union Planters pointed out three changes. The first two are related. Compared to the 2000 financial statement, the 2001 financial statement shows almost $600,000 more in accounts payable and almost $1,000,000 more in current liabilities. The additional increase of about $400,000 in current liabilities is made up almost entirely of an increase in the current portion of notes payable. The third change was in retained earnings. They had decreased by about $200,000.

The 2001 financial statement shows some other changes. Long term liabilities decreased by about $334,000, with the result that total liabilities were about $642,000 more than they were at the end of 2000. Assets increased by about $400,000. Net worth did not disappear, but it dropped to about $40,000.

Of course, Union Planters had only the 2000 financial statement, not the 2001 financial statement, when it made the loan in May 2002. Apparently, Mr. Abbott also did not have the 2001 financial statement until after Union Planters made the loan. Union Planters argues, in effect, that Mr. Abbott should have known about or should be treated as if he knew about these changes in A & F's financial condition.

Union Planters' witnesses did not testify to whether the decrease in retained earnings would have been considered a material adverse change by itself or in combination with the increase in liabilities or in light of all the information in the 2001 financial statement compared to the 2000 financial statement. Mr. Abbott was not asked about the cause or the meaning of the decrease in retained earnings. The court can not find that the decrease was large enough to be a material adverse change simply because 200,000 is a large number of dollars to most people and many small businesses. A & F owed, earned, and handled large amounts of money, as shown by the financial statements. In light of the lack of evidence, the court need not consider whether the 2000 financial statement was materially false as a result of the decrease in retained earnings shown by the 2001 financial statement.

As to the increase in accounts payable, Mr. Abbott explained that each of the financial statements set out the facts at the end of a particular month, and accounts payable could vary greatly from the end of one month to the next, according to the timing of A & F's projects and its receipt of payments from contractors. Mr. Abbott stated that he would not necessarily have been aware of this kind of increase in accounts payable in an end-of-the-month financial statement.

Mr. Anderton testified that he could not have approved the loan if he had known that A & F's current liabilities were about $1,000,000 more at the end of 2001 than at the end of 2000. Mr. Anderton said that the loan would not have been within Union Planters' guidelines. The question, however, assumed no other changes in A & F's balance sheet. The question did not ask Mr. Anderton to assume a decrease of about $334,000 in long term liabilities, an increase in assets of about $400,000, or a continued positive net worth of about $40,000 – all of which were shown by the 2001 financial statement. As a result, the question seems to have made an unstated assumption – that the $1,000,000 increase in A & F's current liabilities would have made A & F $1,000,000 worse off compared to the 2000 financial statement. On the other hand, Mr. Anderton's testimony could mean that the loan would have been outside Union Planters' guidelines and beyond his authority to approve based purely on the dollar amount of A & F's current liabilities as shown in the 2001 financial statement – without regard to the overall financial condition shown by the 2001 financial statement.

Neither Mr. Anderton nor Mr. Abbott testified about the increase in the current portion of accounts payable as a separate item from the increase in total liabilities.

The evidence is unclear as to whether the increase in current liabilities was actually a significant adverse change in A & F's *overall* financial condition. Mr. Abbott testified to the effect that the large increase in accounts payable was probably a temporary fluctuation, and such large fluctuations were usual and not remarkable in A & F's business. By the time of the loan in May 2002, the accounts payable could have gone up and down several times in the course of A & F's business after December 31, 2001, the date of the 2001 financial statement. The larger amount of accounts payable at the end of 2001, compared to the end of 2000, did not necessarily mean that A & F was getting behind in paying its bills.

As to the large increase in the current portion of notes payable, the evidence did not show whether this line item was subject to the same kind of repeated, large changes in the total. It may have been since it apparently would have included short term notes.

The evidence did not put the $1,000,000 increase in current liabilities in context as an indicator of A & F's overall financial condition at the end of 2001. The testimony did not consider the increase in light of other items in the 2001 financial statement or other differences between the 2000 financial statement and the 2001 financial statement. Mr. Abbott testified that the $600,000 increase in accounts payable was not necessarily unusual or noteworthy. In these circumstances, the size of the increase in current liabilities is not sufficient, by itself, to convince the court that the increase represented a material adverse change in A & F's overall financial condition.

In summary, Union Planters has failed to prove that the increase in current liabilities was such a significant adverse change in A & F's financial condition that the 2000 financial statement became materially false as a representation of A & F's financial condition in May 2002.

For the purpose of argument, however, the court assumes that the increase in current liabilities was material because it was material to Union Planters. This assumption involves taking Mr. Anderton's testimony to mean that the increase of about $1,000,000 in current liabilities would have prevented him from approving the loan – even if a closer look at the 2001 financial statement would have revealed that A & F's overall financial condition was not significantly worse than the condition revealed by the end of 2000 financial statement. Union Planters still can not prevail because the facts do not show that Mr. Abbott had the required intent to deceive.

The question is whether Mr. Abbott intended to deceive Union Planters by treating A & F's 2000 financial statement as still accurate despite the substantial increase in accounts payable or current liabilities. Mr. Abbott intended to provide accurate financial information. He thought the loan would be made on the basis of the collateral as security. On the other hand, the court assumes Mr. Abbott realized Union Planters would rely on the 2000 financial statement in some way. He may not have known the extent to which it would rely, but he knew Union Planters could not make the loan without a financial statement. Assuming Mr. Abbott knew about the $600,000 increase in accounts

21

payable, he would not have viewed it as a remarkable change that should have been reported to Union Planters. The evidence also fails to prove that Mr. Abbott should have viewed the increase in current liabilities as a change that he should have reported to Union Planters.

Intent to deceive includes the actual intent to deceive and the reckless intent to deceive. Recklessness means conscious indifference to whether the information is accurate despite knowing that the information is relevant to whether the lender will make the loan. *Investors Credit Corp. v. Batie (In re Batie)*, 995 F.2d 85 (6th Cir. 1993); *Haney v. Copeland (In re Copeland)*, 291 B.R. 740 (Bankr. E. D. Tenn. 2003). Intent to deceive may be inferred when the apparently adverse change in financial condition was so great that the debtor could not or should not have failed to notice it and to realize it was material to the lender's decision. *See Cutillo v. Hubner*, 247 B.R. 766 (S. D. Ind. 2000); *Haney v. Copeland (In re Copeland)*, 291 B.R. 740 (Bankr. E. D. Tenn. 2003); *First American Bank v. Bodenstein (In re Bodenstein)*, 168 B.R. 23 (Bankr. E. D. N. Y. 1994). Based on the preceding discussion of the evidence in this case, the court rejects any such inference as to Mr. Abbott's intent. The court concludes that Mr. Abbott did not intend to deceive Union Planters by allowing it to rely on A & F's 2000 financial statement as still accurate even if he knew about or should have known about the larger amount of current liabilities and the smaller amount of retained earnings on December 31, 2001.

The court turns now to Mr. Abbott's use of his personal financial statement for 2000. Mr. Anderton testified that in deciding whether to make the loan, he relied on the financial statement's representation that Mr. Abbott had a net worth of about $769,000. The financial statement showed this positive net worth only because Mr. Abbott failed to list his debt to A & F for shareholder advances and his contingent liabilities on many of A & F's debts. Union Planters also argued that the financial statement was materially false because it ignored a major adverse change in Mr. Abbott's financial condition between December 31, 2000 and the time of the loan. The alleged change was an increase of about $121,000 in Mr. Abbott's debt to A & F for shareholder advances.

The court need not be concerned with the omission of Mr. Abbott's debt for shareholder advances. The debt was revealed to Union Planters in A & F's 2000 financial statement that Mr. Abbott

provided to Union Planters before it made the loan. Union Planters could not have been deceived by omission of the debt from Mr. Abbott's personal financial statement. A sophisticated lender can not prevail on the theory the debtor's financial statement was misleading because it omitted a large debt, when the debtor disclosed the debt in another document that was provided to the lender – especially when the debtor provided the other document for the purpose of obtaining the loan in question, and the lender asserts that the other document was an important factor in its decision to make the loan. See *Sinclair Oil Corp. v. Jones (In re Jones)*, 31 F.3d 659 (8th Cir. 1994); *Fahey Banking Co. v. Parsell (In re Parsell)*, 172 B.R. 226 (Bankr. N. D. Ohio 1994).

The question is whether omission of the contingent liabilities made Mr. Abbott's financial statement materially false. That question is connected to the question of whether Mr. Abbott provided his financial statement with the intent to deceive and the question of whether Union Planters reasonably relied on either Mr. Abbott's or A & F's financial statement. These questions are also connected to another argument that Union Planters made and the court has reserved until now. The argument is that Union Planters relied on A & F's net worth as shown by its 2000 financial statement. The connection between all these questions should become obvious in the following discussion of whether Union Planters reasonably relied on A & F's or Mr. Abbott's financial statement.

To decide whether Union Planters reasonably relied on the financial statements, the court must consider all the facts that reflect on reliance and the reasonableness of reliance. *Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163 (6th Cir. 1985). Such facts include, but are not limited to, whether there was a close personal relationship or friendship between the debtor and the lender, whether previous dealings had produced a relationship in which the lender trusted the debtor, whether the loan was for personal use or a business venture, whether there were any red flags that suggested the written information was inaccurate, and whether a minimal investigation would have revealed the inaccuracy. The reasonableness requirement is a loose standard that prevents a lender from looking the other way in the face of facts that ought to raise a question as to the accuracy of the information provided by the debtor. *BancBoston Mortgage v. Ledford (In re Ledford)*, 970 F.2d 1556 (6th Cir. 1992).

Mr. Abbott had been running A & F for many years before he approached Mr. Anderton about obtaining a loan from Union Planters. Mr. Abbott had a good reputation in the community, and Mr. Anderton knew it. On the other hand, Mr. Abbott did not have a history of prior business dealings with Mr. Anderton or Union Planters that could have given them good reasons to trust the financial statements without looking beyond a few bottom line amounts. When the debtor and lender do not have an existing relationship of trust based on prior dealings, the lender has a greater duty of care in dealing with financial information provided by the debtor. *Compare Fleming Companies, Inc. v. Eckert (In re Eckert)*, 221 B.R. 40 (Bankr. S. D. Fla. 1998), *and First Commercial Bank v. Robinson (In re Robinson)*, 192 B.R. 569 (Bankr. N. D. Ala. 1996).

When Mr. Abbott first met with Mr. Anderton about obtaining a loan from Union Planters, Mr. Abbott's explanation of why A & F needed the loan amounted to saying that A & F was in financial difficulty. Union Planters knew from the beginning of the transaction that it was dealing with a borrower whose ability to pay was questionable. This knowledge should have triggered Union Planters to be more, not less, vigilant in deciding whether A & F and Mr. Abbott would be able to repay the loan. *Banknorth, N. A. v. Sanders (In re Cassar)*, 325 B.R. 62 (Bankr. D. N. H. 2005); *Midwest Bank and Trust Co. v. Baratta (In re Baratta)*, 272 B.R. 501 (Bankr. M. D. Fla. 2001).

Union Planters failed to follow its usual procedures in making the loan. Mr. Sorrells had the impression that the loan was approved before he ever looked at the financial information, and his job was to present a loan that could be approved within Union Planters' lending guidelines. Union Planters did not take some basic precautions that were part of its usual procedure for making such loans. It did not obtain official confirmation of the corporation's name. It did not check the UCC filings for undisclosed liens on A & F's or Mr. Abbott's property. Union Planters' failure to follow its usual procedures is especially notable because this was a very large loan. The failure to follow usual procedures indicates that Union Planters' reliance on the financial statements was not reasonable. *Fairfax State Savings Bank v. McCleary (In re McCleary)*, 284 B.R. 876 (Bankr. N. D. Iowa 2002)

Two other facts suggest that this transaction was out of the ordinary for Union Planters. First, Union Planters made the loan within two weeks after Mr. Abbott's first contact with Mr. Anderton.

That appears to be a short time for a large loan to a company already in financial difficulty. Second, Union Planters trusted Mr. Abbott to distribute the loan proceeds to pay the secured debts to John Deere and American City Bank.

Mr. Abbott expressly or implicitly represented that the financial statements were still reasonably accurate even though they were about 16 months old. Sixteen months was too long in A & F's business for Union Planters to ignore; it should not have accepted the financial statements as accurate without additional inquiry. The court is not saying that a wrongdoer should always escape liability if the victim was very foolish to believe the wrongdoer's statements. The point is that the age of the financial statements was a red flag as to their accuracy. It should have caused Union Planters to question their accuracy and to inquire as to changes in basic facts.

Mr. Abbott's financial statement did not list any contingent liabilities. Those were substantial since he had guaranteed a large amount of A & F's debts. Mr. Anderton expected Mr. Abbott to be a guarantor on all of A & F's banking debts. Mr. Anderton also testified that whether Mr. Abbott had guaranteed A & F's debts should have been important to Union Planters in deciding whether to make the loan. If Mr. Anderton had paid attention to the details of the financial statement, he should have noticed the unexpected absence of any contingent debts. The failure to list any contingent debts was a red flag that should have provoked someone at Union Planters to question the accuracy of Mr. Abbott's financial statement and to inquire. *Insouth Bank v. Michael (In re Michael)*, 265 B.R. 693 (Bankr. W. D. Tenn. 2001) (no expenses or personal property listed); *Fairfax State Savings Bank v. McCleary (In re McCleary)*, 284 B.R. 876 (Bankr. N. D. Iowa 2002).

Mr. Abbott's financial statement failed to list his debt to A & F for shareholder advances. The court has already decided that this omission could not have been misleading because the debt was disclosed to Union Planters in A & F's financial statement before Union Planters made the loan. On the question of reasonable reliance, Mr. Anderton could not have reasonably relied on Mr. Abbott's net worth as shown by his financial statement because he had notice of the large, unlisted debt to A & F for shareholder advances. *Banknorth, N. A. v. Sanders (In re Cassar)*, 325 B.R. 62 (Bankr. D. N.

H. 2005)  *Blue Ridge Bank & Trust v. Cascio (In re Cascio)*, 318 B.R. 567 (Bankr. D. Kan. 2004);

*Dominion Bank v. Wingo (In re Wingo)*, 112 B.R. 141 (W. D. Va. 1990).

Taken together, the two financial statements contained another red flag that goes to

the heart of this transaction. A cursory review of the two financial statements would have revealed the

key fact as to the net worth figures for both A & F and Mr. Abbott. A & F's net worth depended on Mr.

Abbott's debt to A & F for shareholder advances, and Mr. Abbott's net worth depended on the value

of his interest in A & F, which depended on A & F's ability to generate income. Thus, A & F's true

financial condition and Mr. Abbott's true financial condition depended on the ability of A & F to

generate net income for itself and Mr. Abbott.

In this regard, Mr. Abbott testified that A & F's income was his only source for paying

his debt to A & F for shareholder advances. Even if he borrowed money to pay the debt, his ability to

borrow and his repayment of the loans depended on the success of A & F's business. In other words,

Mr. Abbott's *and* A & F's real financial condition depended on A & F's ability to make money. Mr.

Sorrells understood this; he testified that the loan was based on the value of the collateral and on A

& F's cash flow, and net worth had nothing to do with making the loan. Mr. Anderton's actions reflected

the same understanding of A & F's and Mr. Abbott's financial situation.

Along the same lines, Mr. Abbott testified that he identified himself with the corporation;

he was the corporation. In other words, he viewed the situation as being essentially the same as if he

were the sole proprietor of the business.

Consider also the effect of Mr. Abbott's payments on the debt for shareholder

advances. He testified that after obtaining the loan from Union Planters, he borrowed money from

another bank to make substantial payments on the debt to A & F for shareholder advances. Borrowing

to make the payments amounted to substituting the lender as the creditor in the place of A & F. It was

also essentially the same as borrowing money to add to the corporation's capital.

Perhaps the court should not refer to the financial interdependence of Mr. Abbott and

A & F as a red flag. Banks that lend to closely held corporations are likely to face this situation often.

The owner-operator may have acquired substantial personal assets other than his interest in the

company, but he may have mortgaged them to provide money for the business. He is also likely to have substantial personal debts as a guarantor or co-signer for the business, and some of those debts may be secured by his personal assets. A bank that lends money to the business is most likely to rely on collateral and on the success of the business for repayment. This red flag marks the obvious facts of life regarding the combined financial condition of A & F and Mr. Abbott. Union Planters appears to have understood these facts and to have made the loan in light of them.

The actions of Mr. Anderton and Mr. Sorrells support this conclusion. Mr. Anderton determined the amount of the loan from the value of the collateral. Mr. Abbott did not ask for any particular amount. Likewise, Mr. Sorrells' only real examination of the financial statements was for the purpose of determining whether A & F's cash flow would allow it to make the payments. The loan was based on those facts, not on whether A & F or Mr. Abbott had any net worth separate from A & F's ability to generate income.

Mr. Sorrells' review and use of the financial statements was affected by his understanding that Mr. Anderton had already approved the loan. The bottom line amounts in the financial statements satisfied the lending requirements set by Union Planters. Mr. Sorrells took those amounts as true without even a slightly skeptical review of the financial statements. If Mr. Sorrells had done such a review, he could not have missed the obvious point that Mr. Abbott's financial condition and A & F's financial condition were mutually dependent. Indeed, Mr. Sorrells' testimony indicates an instinctive understanding of this relationship. The loan had to be based on the value of the collateral and A & F's cash flow (ability to pay) because net worth meant very little.

Mr. Sorrells' primary task was making a cash flow analysis based on the information provided to Union Planters. Mr. Sorrells may have reasonably relied on the financial statements in making the cash flow analysis. Assuming he did, Mr. Sorrells testified that the problems with the financial statements were not directly related to A & F's cash flow. Thus, the evidence did not prove that the alleged falsity of the financial statements affected Mr. Sorrells calculation of A & F's cash flow.

Mr. Anderton also testified that he was not familiar with the alleged problems with the financial statements until the day of the trial. Before the trial, his main complaint against Mr. Abbott

was the alleged failure to notify Union Planters of First National's blanket security interest in A & F's equipment. The court was left with the clear impression that Mr. Anderton relied on having a first security interest in the collateral and on A & F's income. In other words, Mr. Anderton was not concerned with the accuracy of the financial statements beyond looking at bottom line figures that would support making the loan.

Other facts also suggest that Union Planters real complaint is the alleged failure of Mr. Abbott to reveal First National's security interest – not the alleged inaccuracies in the financial statements. For example, the amount of accounts payable at any one moment – independent of other facts usually shown in a financial statement – is not necessarily a meaningful or key statistic in determining the financial condition of the business for the purpose of deciding whether to make a loan. Likewise, the increase in Mr. Abbott's debt for shareholder advances is not a meaningful statistic when separated from other facts relevant to Mr. Abbott's financial condition.

In summary, Mr. Anderton and Mr. Sorrells understood the key factors supporting the loan – the value of the collateral and A & F's income. They needed the written information to check A & F's cash flow and fill in the blanks to meet Union Planters' lending criteria. Instead of making a serious attempt to consider all the information in the financial statements, Union Planters merely took the bottom line figures that supported the making of the loan. *Dominion Bank v. Wingo (In re Wingo)*, 112 B.R. 141 (W. D. Va. 1990). The financial statements themselves cast serious doubts on the bottom line amounts that Union Planters used to support making the loan. More importantly, Union Planters actually relied upon the value of the collateral and A & F's cash flow, and the evidence does not show that the financial statements were misleading on either of those points. *Chrysler Credit Corp. v. Ruwart (In re Ruwart)*, 114 B.R. 725 (D. Colo. 1990). In the process of deciding whether to make the loan, Union Planters did not reasonably rely on the financial statements.

This brings the court back to the question of Mr. Abbott's intent when he provided his financial statement to Union Planters. The relationship of Mr. Abbott's financial condition and A & F's financial condition causes problems in deciding whether Mr. Abbott had the intent to deceive. Mr. Abbott's many years of running the business and borrowing money should have taught him the

meaning of contingent liabilities. *Citibank v. Williams (In re Williams)*, 159 B.R. 648 (Bankr. D. R. I. 1993). The contingent liabilities, however, were guaranties of A & F's debts. Mr. Abbott explained that he considered himself liable for A & F's debts, guaranteed or not, and A & F's financial statement showed the amount of its debts. He was apparently working on the assumption that Union Planters would automatically treat him as liable for A & F's debts.

The facts also do not suggest that Mr. Abbott intentionally omitted the debt for shareholder advances to increase his net worth so that Union Planters would make the loan. In a corporation owned and operated by one shareholder, the shareholder may justifiably think that a debt to the corporation for shareholder advances is not a real debt. Likewise, an increase in the debt would not necessarily be worth noting. Furthermore, the debt was revealed to Union Planters in A & F's financial statement. Finally, Mr. Abbott had good reason to think the loan was being made on the basis of the value of the collateral and A & F's ability to pay from its cash flow. The court concludes that Mr. Abbott did not have the actual intent to deceive when he provided his personal financial statement as a still accurate reflection of his financial condition.

As to reckless intent to deceive, the question is closer. The main problem, of course, is Mr. Abbott's failure to list contingent liabilities. The court has attempted to understand Mr. Abbott's attitude. His testimony was not entirely clear but his thinking may have been clear on practical matters. A & F was the proposed borrower, and the loan was to be based on the value of the collateral *and* A & F's ability to pay. The question for Union Planters was whether A & F could pay its other debts *and* pay Union Planters. Mr. Abbott considered himself to be secondarily liable for all of A & F's debts. He apparently thought that Union Planters would make the same assumption. Mr. Anderton's testimony supports the conclusion that Union Planters expected Mr. Abbott to be liable as a guarantor on many of A & F's debts. Mr. Abbott understood that if A & F could not pay its other debts and pay Union Planters, then neither could he, because his ability to pay depended on A & F's ability. Union Planters' actions suggested it understood this fact. As a result, Mr. Abbott saw no need to make sure that Union Planters knew he was liable for A & F's debts. His separate financial condition depended on his assets other than his ownership of A & F. The court concludes that Mr. Abbott did not have the reckless intent

to deceive Union Planters when he provided it with his 2000 personal financial statement as an accurate picture of his financial situation.

The court's discussion reveals the problem with deciding whether Mr. Abbott's financial statement was materially false. The court could say that it was clearly materially false according to accepted accounting rules. Was it obviously false, however, in the context of Mr. Abbott's and A & F's combined financial condition? The court will not take up the question since the court has concluded that Union Planters did not reasonably rely on either financial statement and Mr. Abbott did not have the intent to deceive.

The facts raise a question as to whether Mr. Abbott might owe a debt that can be excepted from discharge under § 523(a)(2)(A). 11 U.S.C. § 523(a)(2)(A). The theory is that Mr. Abbott's failure to reveal changes in financial condition after the date of the 2000 financial statements amounted to a fraud or false pretense, other than a *statement* respecting his financial condition, and enabled him to obtain the loan. The law is unclear as to whether § 523(a)(2)(A) can apply in this situation. *Compare First National Bank v. Nilles*, 35 B.R. 409 (N. D. Ill. 1983) (yes), *and Founders Bank v. Moore (In re Moore)*, 118 B.R. 64 (Bankr. N. D. Tex. 1990) (no). In any event, the court's reasoning has established that Mr. Abbott did not have the intent to deceive required to except a debt from discharge under § 523(a)(2)(A). *Clyde-Finlay v. Burwell (In re Burwell)*, 276 B.R. 851 (Bankr. N. D. Ohio 2002); *First National Bank v. Nilles*, 35 B.R. 409 (N. D. Ill. 1983).

<u>Failure to reveal First National's blanket security interest in A & F's equipment</u>

The question is whether the court believes Mr. Abbott or Mr. Anderton and Mr. Sorrells. Mr. Abbott's testimony reflected his truthfulness. He readily admitted facts that were against his interest. He tried to explain his actions truthfully and openly according to his understanding of what was going on.

Mr. Abbott testified to a pattern of behavior. Whenever he talked to a banker about a loan, he always pointed out First National's blanket security interest in everything. This could have been wishful remembering — since he usually did it, he must have done it this time. On the other hand, he did testify to a pattern of revealing First National's blanket security interest in some form or

fashion. The evidence did not convince the court that Mr. Abbott intentionally departed from that pattern so that he could obtain the loan from Union Planters and also preserve First National's first security interest in the proposed collateral. The evidence points the other way. Mr. Abbott testified to mentioning the First National's blanket security to Mr. Anderton again before the loan was made. Mr. Abbott stated to Mr. Anderton that he did not know whether First National had subordinated its blanket security interest to American City Bank's security interest in part of the equipment that was to secure the debt to Union Planters. Mr. Abbott also remembered Mr. Anderton's reply that Union Planters would take care of that problem. Mr. Abbott's subsequent actions were also consistent with his belief that Union Planters' security interest had priority over First National's security interest.

In his testimony, Mr. Anderton followed the tactic of making the opposing lawyer work hard. He answered questions truthfully but narrowly. Mr. Anderton testified that if he had seen the $300,000 line of credit in A & F's 2000 financial statement, he would not have thought the description referred to a blanket lien because it did not mention subsequently acquired property. This was a short description in a financial statement, not a description in a security agreement or UCC financing statement. Surely, any banker who read the description in the process of making a secured loan would be provoked to find out more because it appeared to describe a blanket security interest on all the borrower's assets whenever acquired.

Mr. Sorrells admitted knowing that the $300,000 line of credit shown in A & F's financial statement was a debt to First National. He denied having any idea that Union Planters' collateral would be subject to the security interest for the line of credit. This denial does not make sense. The description of the security interest for the line of credit suggests that it would apply to Union Planters' collateral. Why would Mr. Sorrells think that it would not apply and would not come ahead of Union Planters' security interest? The transaction could have been structured to put Union Planters in the same position as American City Bank and John Deere, but that was not in the documents that Mr. Sorrells prepared. The transaction could have involved a subordination agreement with First National, but Mr. Sorrells did not prepare one or see one. Mr. Sorrells may have simply assumed that Union

Planters would have the first security interest because that was its policy, even though he did not know exactly how it would be first.

Mr. Abbott's lawyer brought up Mr. Anderton's conversations with Brac Thoma, First National's president, in an effort to show that Mr. Anderton knew about First National's blanket security interest before Union Planters' made the loan. The evidence, however, was confusing as to the timing of these conversations. The evidence suggests this sequence of events: (1) Union Planters made the loan without knowledge of First National's blanket security interest, or Union Planters had notice of First National's security interest but failed to take it into account before making the loan; (2) after making the loan, Union Planters discovered or realized that First National had a superior security interest in Union Planters' collateral; (3) Mr. Anderton talked to Mr. Thoma at First National about dividing all the loan debts between the banks, according to which were business and which were personal, as a method of mitigating the problem for Union Planters caused by First National's higher priority security interest.

Of course, Mr. Anderton could have been pursuing the same idea after Union Planters made the loan but before he found out that First National had a superior security interest in Union Planters' collateral. That sequence of events makes more sense. If Mr. Anderton had discovered First National's superior security interest soon after making the loan, he surely would have taken other steps to mitigate the problem, rather than simply pursuing the idea of a complex division of business and personal debts between the two banks. Likewise, the failure of Mr. Anderton and Mr. Thoma to discuss subordination of First National's security interest suggests that these conversations occurred after Union Planters made the loan but before Mr. Anderton realized that First National had a superior security interest in Union Planters' collateral. If the first conversation occurred before Union Planters made the loan, then surely Mr. Anderton would have asked about *any* security interest First National might have had and found out if subordination was needed. Six or seven months after Union Planters made the loan, Mr. Abbott and Mr. Barnes were talking about selling bulldozers that were Union Planters' collateral, and both of them still assumed that Union Planters had the first priority security

interest. The court is inclined to believe that these conversations between Mr. Anderton and Mr. Thoma began after Union Planters made the loan.

Nevertheless, the court concludes that Union Planters had notice of First National's security interest in all of A & F's equipment before it made the loan. The court finds that Mr. Abbott mentioned First National's security interest in his meetings with Mr. Anderton before the loan was made. Mr. Abbott did not conceal the existence of the security interest, though he may not have emphasized it as much as he should have. The evidence certainly does not support the theory that Mr. Abbott revealed First National's security interest but then deceived Union Planters into believing either that the security interest did not apply to Union Planters' collateral or that Union Planter's security interest would somehow have priority. That kind of deception appears to be foreign to Mr. Abbott (not to mention unlikely to succeed). Furthermore, the court is not convinced by Mr. Anderton's and Mr. Sorrells' attempts to explain away the description in A & F's financial statement of a security interest in all of A & F's equipment. The description should have prompted any banker to, at the least, ask Mr. Abbott about other security interests in A & F's equipment. Union Planters can not prevail on the theory that Mr. Abbott concealed the existence of First National's security interest in A & F's equipment because he did not conceal it.

The paid for equipment

The "paid for" equipment did not include the equipment subject to John Deere's and American City Bank's security interests. It applied to the two pieces of equipment that were subject to First National's blanket security interest but not to any other security interest. The meaning of "paid for" was disputed, but Mr. Abbott's understanding is not beyond acceptance. The president of First National, Mr. Thoma, testified to the effect that Mr. Abbott's explanation made sense. Moreover, anyone who was paying attention to the situation would *not* have taken "paid for" as equivalent to "lien free". The description should have raised a question that Union Planters should have pursued. Furthermore, the problem with the paid for equipment was the attachment of First National's blanket security interest. The court has already concluded that Union Planters knew of First National's blanket security interest before it made the loan and simply failed to act accordingly. Even if the "paid for"

description was misleading, it was not a separate wrong or a separate cause of any harm to Union Planters.

Conclusion

In summary, the loan transaction did not result in any debt from Mr. Abbott to Union Planters that can be excepted from discharge under § 523(a)(2)(B). The court will enter judgment for Mr. Abbott holding that his debt to Union Planters was discharged and dismissing the complaint.

# # #